Karen J. CONNELLY and S.Y.K., LLC, Plaintiffs,

v.

VALUEVISION MEDIA, INC. d/b/a ShopNBC, Defendant.

No. Civ.04–4559 DWF/FLN.

United States District Court,
D. Minnesota.

Jan. 3, 2005.

Daniel Q. Poretti, and Douglas J. Frederick, Rider Bennett, LLP, Minneapolis, MN, for Plaintiffs.

Kevin D. Conneely, and Eric D. Paulsrud, Leonard Street and Deinard, Minneapolis, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER

FRANK, District Judge.

### Introduction

The above-entitled matter was brought before the undersigned United States District Judge on December 15, 2004, pursuant to Plaintiffs Karen J. Connelly's and S.Y.K., LLC's (collectively "Plaintiffs") Motion for a Preliminary Injunction. Specifically, Plaintiffs request that this Court enter a preliminary injunction enjoining and restraining Defendant ValueVision Media, Inc. d/b/a ShopNBC ("ShopNBC") from using the "Sincerely Yours, Karen" mark or any other mark confusingly similar to the "Sincerely Yours, Karen" mark, including the term "Sincerely Yours," in connection with any service or product associated with jewelry or the sale of jewelry. For the reasons set forth below, the Court grants Plaintiffs' Motion for Preliminary Injunction.

### Background [1]

Plaintiff Karen J. Connelly is a television program host who has worked in the home shopping industry for companies such as the Home Shopping Club, the Cable Value Network and USA Direct. Connelly has sold a variety of products, but has focused primarily on selling jewelry. Connelly has worked in the industry for 20 years and is one of the industry's original hosts.

ShopNBC is a television and Internet shopping network that sells a variety of products to consumers. ShopNBC buys and resells vendors' products, such as jewelry, consumer electronics, apparel, and

[1] The facts discussed in this Court's November 9, 2004, Order are incorporated herein.

health and beauty items. ShopNBC provides air time and web space to promote and resell these products.

In 1992, Connelly began working as an on-air television host with ShopNBC. Plaintiffs claim that Connelly hosted the first program on ShopNBC to achieve over $1 million of sales in one hour and that she was recognized by ShopNBC as the top sales host. Connelly and ShopNBC entered into a written employment agreement effective as of November 8, 1999 (the "1999 Agreement"). The 1999 Agreement contained a provision addressing ownership of intellectual property:

> 8. *Inventions and Patents.* Employee agrees that all inventions, innovations or improvements in the method of conducting Employer's business or otherwise related to Employer's business (including new contributions, improvements, ideas and discoveries, whether patentable or not or otherwise protectable by copyright, trademark, common law or trade secret law) conceived or made by Employee during the Employment Period belong to the Employer. Employee will promptly disclose such inventions, innovations and improvements to Employer and perform all actions reasonably requested by Employer to establish and confirm such ownership.

(*See* Affidavit of Karen J. Connelly in Support of Plaintiffs' Motion for a Temporary Restraining Order or a Preliminary Injunction ("Connelly Aff."), Ex. C ¶ 8.) The 1999 Agreement also contained a non-competition provision prohibiting Connelly from owning or participating in a "Restricted Business." (*See* Connelly Aff., Ex. C ¶ 9.) In addition, the 1999 Agreement provided that it may "be amended only by an agreement in writing and signed by the parties hereto." *Id.* ¶ 16.

In February 2002, Connelly began to consider designing her own jewelry line and decided to use the name "Simply Yours, Karen." (*See* Declaration of Rebecca Beerling, ¶ 2, Ex. A (Connelly Depo.) at 117–20.) Plaintiffs claim that because Connelly thought her contemplated business might be a "Restricted Business" under the 1999 Agreement, she approached ShopNBC, and in particular Gene McCaffery, then the Chief Executive Officer at ShopNBC, to discuss her business idea and the possibility of becoming a vendor of ShopNBC. During this meeting, Plaintiffs claim that Connelly told McCaffery that it would be necessary to restructure the terms of the 1999 Agreement to address the fact that she would be operating an outside business. In addition, Plaintiffs claim that Connelly informed McCaffery that she had selected "Sincerely Yours, Karen" as the name of her prospective jewelry line. Plaintiffs also claim that Connelly showed McCaffery sketches of the prospective line and that McCaffery gave Connelly his "blessings and said that she should be sure to 'own' it." (Connelly Aff. at ¶ 14.)

McCaffery testified that he recalls having a meeting with Connelly sometime in the spring of 2002. (*See* Supplemental Affidavit of Douglas J. Frederick in Support of Plaintiffs' Motion for Preliminary Injunction ("Supp. Frederick Aff."), Ex. 1 (McCaffery Depo.) at 24–33.) McCaffery testified that he learned that Connelly wanted to start a line of jewelry and that she had teamed up with a large jewelry company. (*Id.* at 26.) McCaffery also testified that:

> Towards the end of our meeting I told her that I thought she should be careful that she was going to have a line of goods that—that what she should be careful of is that she had some control over what happens with whatever she

does with Chuck Clemency or whoever else, Chuck's company.... I told her I thought if she was going to pursue this she should be careful to make sure that she has some control over what happens to the products that she represents on the air.

(*Id.* at 30–31.) McCaffery further testified that during this initial meeting, Connelly mentioned her idea for the name of her jewelry line:

> ... I know it was going to be something with her name in it, but I don't know that she had settled in on a name at that time particularly. I think it's quite possible that in the materials that she had that Sincerely Yours might have been in the materials, I just don't remember, but I know it was going to be working around her name....

(*Id.* at 33.)

On or about April 8, 2002, a second meeting took place involving Connelly, McCaffery, others at ShopNBC, and a representative of the company with which Connelly was to partner. (Supp. Frederick Aff., Ex. 1 (McCaffery Depo.) at 42–51.) At this time, Plaintiffs claim that McCaffery fully understood that Connelly's jewelry would be called "Sincerely Yours, Karen" and that he knew it was a venture of hers. (*Id.* at 44.) Moreover, Plaintiffs claim that by the end of this second meeting, ShopNBC had essentially approved of Connelly's endeavor. (*Id.* at 50.) There is no dispute that McCaffery agreed that Connelly's idea would move forward and that the venture did proceed successfully. (*Id.* at 27; 52–53.)

Plaintiffs claim that throughout these negotiations, Connelly made it known that the "Sincerely Yours, Karen" business was Connelly's own endeavor and that she would own it. In contrast, with respect to the first meeting in spring 2002, ShopNBC claims that no agreement was reached that would have allowed Connelly to develop and own a vendor-company as an "outside interest" and that McCaffery only agreed to have more meetings to further develop the idea. (*See* Beerling Decl., Ex. B (McCaffery Depo.) at 27; 35–36;105–07.) ShopNBC also claims that with respect to the second meeting, no deal was reached and there was no signed, written amendment to the 1999 Agreement. In addition, ShopNBC claims that at no time did anyone specifically discuss trademarks. (*See* Beerling Decl., Ex A. (Connelly Depo.) at 67.) Moreover, ShopNBC claims that McCaffery would not have approved any venture that would have allowed Connelly to move outside ShopNBC. (*Id.* Ex. B. (McCaffery Depo.) at 45–46.)

In June 2002, Connelly applied to register the trademarks "Sincerely Yours, Karen" and "Karen Connelly" with the United States Patent and Trademark Office ("USPTO") and claims to have spoken openly about her alleged ownership of those marks.[2] ShopNBC claims that it never authorized the filing of the trademark application and did not receive notice of it until after Connelly's departure. In August 2002, during the continuing contract negotiations with ShopNBC, Connelly started a business entity named S.Y.K., LLC. Also in August 2002, Connelly and ShopNBC corresponded regarding proposed terms and exchanged draft agreements. For example, Connelly wrote to representatives of ShopNBC in regard to a proposed version of Connelly's employment contract with ShopNBC, stating:

---

**2.** On December 14, 2004, the USPTO issued a federal registration for the "Sincerely Yours, Karen" mark.

This proposed agreement is also not what I had in mind. As you know I will be launching my jewelry line in October with ShopNBC's expressed approval, support, and enthusiasm. Any employment agreement I have with ShopNBC must be consistent with this new venture, as well as include my new employment terms. The agreement, as written, seems to be inconsistent with this venture in some respects, and does not contain all of the employment terms I desire. Therefore, I cannot accept this proposed agreement as written. I will be submitting a revised agreement that includes my proposed employment terms, as well as provisions addressing (and consistent with) my new business venture shortly.

(Beerling Decl., ¶ 24, Exh. W.) On September 19, 2002, Connelly, through her attorneys, provided her own proposed agreement to ShopNBC. (*See* Supplemental Affidavit of Karen J. Connelly in Support of Plaintiffs' Motion for a Preliminary Injunction ("Supp. Connelly Aff."), ¶ 6 Ex. 5.) Connelly's attorney removed the "Inventions and Patents" provision that had been part of Connelly's previous contract with ShopNBC. (*See* Beerling Decl., ¶ 25 Exh. X.)

On October 2, 2003, Connelly's attorney explained to representatives of ShopNBC that Connelly "owns 100% of Sincerely Yours, Karen" and that "[a]s an owner she will enter into relationships with vendors, manufacturers, etc [sic], and become a vendor herself." (*See* Supp. Connelly Aff. at ¶ 9 Ex. 8.) Connelly's attorney also stated that "given that Ms. Connelly has and will be inventing and owning patents for goods related to her business, she cannot sign the 'inventions and patents' provision in the proposed agreement, and we have eliminated that provision" and that Connelly would agree to "separately pursue the terms relating to Sincerely Yours, Kar-

en." (*Id.*) ShopNBC never pursued the terms relating to "Sincerely Yours, Karen" separately. In addition, Connelly's attorney proposed new language allowing Connelly to operate her "Sincerely Yours, Karen" business outside of the scope of the Agreement. ShopNBC claims, however, that none of the changes proposed by Connelly's attorney addressed ownership of trademarks and that neither Connelly nor her attorneys ever made ShopNBC aware of the fact that Connelly's attorney had already applied for trademark rights in "Sincerely Yours, Karen."

On October 3, 2002, the parties executed a new employment agreement (the "2002 Agreement") which contained language related to Connelly's "Outside Interest." (*See* Connelly Aff. Ex. H.) Specifically, in paragraph 8 of the 2002 Agreement, the parties created an exception to the intellectual property that was to belong to ShopNBC. This exception covered "all inventions or innovations developed by Employee solely as part of her involvement with Outside Interests (as that term is elsewhere defined in the 2002 Agreement)." (*Id.* Ex. H ¶ 8.) In paragraph 9(c), the parties defined "Outside Interests" in part as "the business that she owns, which is a business engaged in the sale of jewelry . . . on television and through the internet [sic]." (*Id.* at ¶ 9(c).) Further, the parties agreed that "Employer consents to Employee's ownership and participation in the above described Outsider Interest." (*Id.*)

On October 12, 2002, the "Sincerely Yours, Karen" program first aired. ShopNBC contends that it spent significant time and money promoting "Sincerely Yours, Karen" products and claims that the only use of the term "Sincerely Yours, Karen" was in connection with the sale of jewelry on ShopNBC's merchandising program by that name. Moreover, ShopNBC

claims that it credited Connelly's time spent and her bonus money received as part of promoting "Sincerely Yours" jewelry toward her overall compensation package.

On July 23, 2004, Connelly resigned from her ShopNBC position. Since her resignation, Connelly has not appeared as an on-air host for any shopping network and continues to be subject to a six-month non-compete provision. When the non-competition period expires in 2005, Connelly plans to sell the "Sincerely Yours, Karen" collection on a network that will compete with ShopNBC. After Connelly's resignation, ShopNBC continued to air the program "Sincerely Yours, Karen" and to sell and promote jewelry under the "Sincerely Yours, Karen" mark. At some point, ShopNBC shortened the name of the program to "Sincerely Yours."

As of the hearing on Plaintiffs' motion for a temporary restraining order, ShopNBC claimed that it had 1,361 pieces of "Sincerely Yours, Karen" pieces of jewelry in stock, with an average retail price of $664.00 each. ShopNBC expected net sales for these pieces to total over $50,000 in November 2004, just under $50,000 in December 2005, and over $98,000 in January 2005. (See Declaration of Elizabeth Fehr at ¶¶ 9, 11.) Additional programming was planned through January 2005. ShopNBC claims that after being temporarily restrained, it has had to recall, repackage and/or refrain from selling its remaining inventory. It has also reconfigured its website to avoid use of "Sincerely Yours."

ShopNBC contends that it was unaware that Connelly claimed trademark rights until after she quit in July 2004. Plaintiffs, however, maintain that Connelly openly asserted trademark rights in the name "Sincerely Yours, Karen." For example, Plaintiffs assert that Connelly told a number of ShopNBC employees that she was going to own the "Sincerely Yours, Karen" jewelry line, including the trademarks associated thereto. In addition, during the first airing of the "Sincerely Yours, Karen" program in October 2002, Connelly made numerous on-air comments indicating that she owned the "Sincerely Yours, Karen" company and the associated trademarks. (See Connelly Supp. Aff., Ex. 12; Frederick Supp. Aff. ¶ 4 & Ex. 3.)

On October 22, 2004, Plaintiffs filed a complaint asserting causes of action for trademark infringement (Count I), false advertising (Count II), deceptive trade practices (Count III), consumer fraud (Count IV), unlawful trade practices (Count V), misappropriation of right of publicity (Count VI), common law unfair competition (Count VII), and tortious and intentional interference (Count VIII). Pursuant to Plaintiffs' motion for a temporary restraining order ("TRO"), on November 9, 2004, the Court issued a TRO requiring ShopNBC to immediately cease use of the terms "Sincerely Yours, Karen" and "Sincerely Yours." After conducting expedited discovery, Plaintiffs now move the Court for a preliminary injunction.

## Discussion

### I. Standard of Review

Under Eighth Circuit precedent, a preliminary injunction may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm absent the restraining order; (2) that the balance of harms favors the movant; and (3) that the public interest favors the movant; and (4) *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981). None of the factors by itself is determinative; rather, in each case the factors must be balanced to determine whether they tilt toward or away from

granting injunctive relief. *See West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir.1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). The party requesting the injunctive relief bears the "complete burden" of proving all of the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987).

## A. Likelihood of Success on the Merits

█ The first *Dataphase* factor requires that the movant establish a substantial probability of success on the merits of its claim. *See Dataphase*, 640 F.2d at 114. As during the TRO proceedings, the parties have focused their analysis on Plaintiffs' claim that ShopNBC violated the Lanham Act, 15 U.S.C. § 1125(a), *et seq.*[3] To succeed on its trademark infringement claim, Plaintiffs must show ownership of a valid trademark and that ShopNBC's use of the allegedly infringing mark creates a likelihood of confusion. *See Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir.1999).

In its November 9, 2004, Order, the Court found, and the parties do not dispute, that the "Sincerely Yours, Karen" mark is valid and enforceable and that ShopNBC's use of the "Sincerely Yours, Karen" and "Sincerely Yours" marks would create a likelihood of confusion if Plaintiffs are the owners of those marks. *See* November 9, 2004, Order at 8–13.

The heart of the parties' dispute centers on who owns the "Sincerely Yours, Karen" mark. Plaintiffs assert that they own the "Sincerely Yours, Karen" mark regardless of whether the 1999 Agreement or the 2002 Agreement applies to the trademark at issue. Specifically, Plaintiffs assert that if the 1999 Agreement applies, Plaintiffs own the "Sincerely Yours, Karen" mark because: (1) ShopNBC is estopped from disclaiming an oral modification of the 1999 Agreement allowing Connelly to pursue her outside business venture; and (2) ShopNBC failed to request that Connelly take actions to confirm and establish ownership rights as required by the 1999 Agreement. In addition, Plaintiffs assert that under the 2002 Agreement, ShopNBC acknowledged that all rights to Connelly's "Sincerely Yours, Karen" business belonged to Connelly. Connelly points to the language of paragraph 9(c), which exempts Connelly's "Outside Interests" from being considered a "Restricted Business":

> Notwithstanding Section 9(a) above, Employer understands and agrees that Employee may do any of the items specified in paragraph 9(a) with respect to the business that she owns, which is a business engaged in the sale of jewelry and related consumer products on television and through the internet and through other means of distribution (this business, and any other businesses approved by Employer, as set forth below, shall be referred to as "Outside Interest(s)"). Employer consents to Employee's ownership and participation in the above described Outside Interests....

(Connelly Aff. Ex H. ¶ 9(c).) Moreover, Plaintiffs assert that when ShopNBC signed the 2002 Agreement, it specifically acknowledged that Connelly retained the intellectual property rights developed in connection with her "Outside Interests":

---

3. Plaintiffs also argue that it is likely to succeed on the merits of its deceptive trade practices claim. Because that claim mirrors the Lanham Act claim, they are considered together. *See DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 n. 3 (8th Cir.2003). The Court does not consider the likelihood of success on the merits of Plaintiffs' additional causes of action.

*Inventions and Patents.* Except for those inventions or innovations developed by Employee solely as part of her involvement with Outside Interests ..., Employee agrees that all inventions, innovations or improvements ... belong to Employer....

(*Id.* Ex. H. ¶ 8.) Plaintiffs also assert that all parties knew and understood that the business referred to in the 2002 Agreement was her business related to the "Sincerely Yours, Karen" jewelry line.

ShopNBC asserts, on the other hand, that it owns the "Sincerely Yours, Karen" mark under the parties' written contracts. Specifically, ShopNBC claims that until October 3, 2002, the 1999 Agreement controlled the parties' rights and obligations and, therefore, because the trademark at issue arose prior to October 3, 2002, the 1999 Agreement was in force. ShopNBC further claims that any intellectual property rights created by Connelly are the property of ShopNBC under the 1999 Agreement. In support of this argument, ShopNBC asserts that the 1999 Agreement was integrated and was the exclusive governing document in the employment relationship and is also therefore assumed to incorporate the complete intent of the parties. Moreover, ShopNBC asserts that this Court may only consider parol evidence to construe a contract that is ambiguous or incomplete.[4] In the alternative, ShopNBC asserts that even under the 2002 Agreement, the trademark and other intellectual property rights associated with the "Sincerely Yours, Karen" mark vest with ShopNBC. ShopNBC claims that the exception for "inventions or innovations developed by Employee solely as part of her involvement in Outsider Interest" does

not apply to the "Sincerely Yours, Karen" trademark. According to ShopNBC, "Outside Interests" do not include trademarks or improvements in the method of conducting ShopNBC's business and the "Sincerely Yours, Karen" mark was not created "solely" as part of Connelly's involvement of "Outside Interests." Instead, ShopNBC suggests that patents or inventions on goods, such as design patents, could be considered to be outside of Connelly's employment.

### 1. The 1999 Agreement

Plaintiffs assert that even if the 1999 Agreement was in effect when "Sincerely Yours, Karen" was first used, ShopNBC is estopped from disclaiming its oral modification of the Agreement allowing Connelly to pursue her outside business venture of "Sincerely Yours, Karen." The Court agrees. Even though the parties' 1999 Agreement was written and contained a provision barring oral modification, that agreement could still be varied or rescinded by oral agreement. *See, e.g., Winthrop Res. Corp. v. Spearhead Sys. Consultants, Ltd.,* 2002 WL 1127713, *3 (D.Minn. May 29, 2002) (Frank, J.) (citations omitted) (explaining that a written contract may be varied by an oral agreement even if the contract contains a provision barring oral modification). Although ShopNBC denies that it ever made a deal with respect to Connelly's proposed business venture or discussed modifying any specific provisions in the 1999 Agreement, the evidence indicates that both parties clearly understood that Connelly was going to develop her own business under the name "Sincerely Yours, Karen" and that Connelly was to

---

4. ShopNBC asserts that the Court should not consider documents relating to the 2004 negotiations between ShopNBC and Connelly after Connelly's resignation because the documents are irrelevant and were given in the context of Rule 408 settlement negotiations. The Court declines to rule on this issue at this time, as it has not relied on any such documents.

own the trademark rights associated with her business. Both parties' actions subsequent to the initial meetings in April 2002 are consistent with that understanding. ShopNBC, in particular, made numerous representations and inducements to Connelly by indicating early on that it viewed Connelly's "Sincerely Yours, Karen" idea favorably, by telling her that she should maintain "control" of the venture, and by failing to question her various assertions that she owned the "Sincerely Yours, Karen" mark. There is ample evidence in the record demonstrating that ShopNBC understood that Connelly planned to operate the "Sincerely Yours, Karen" business and owned the related trademarks. There is also ample evidence that Connelly reasonably relied on ShopNBC's representations and inducements by restructuring her business contracts with ShopNBC and going forward in organizing and operating her own business. Moreover, in light of the evidence that ShopNBC understood the "Sincerely Yours, Karen" mark was to belong to Connelly, Plaintiffs would be harmed if the Court were to find that the trademark rights in "Sincerely Yours, Karen" belong to ShopNBC simply because the mark was created prior to October 3, 2002. *See, e.g., Winthrop,* 2002 WL 1127713, *3 (citations omitted). Therefore, if the 1999 Agreement applies to the trademark at issue, the Court finds that Plaintiffs will likely succeed in demonstrating that the 1999 Agreement was modified orally by the parties to allow Connelly to develop and own "Sincerely Yours, Karen."

Alternatively, the Court finds that if the 1999 Agreement was not modified, Plaintiffs are still likely to succeed on demonstrating ownership of the "Sincerely Yours, Karen" mark because ShopNBC failed to request any action by Connelly to establish or confirm its alleged ownership of the mark. Paragraph 8 of the 1999 Agreement contained the following language in relation to inventions and patents:

8.   *Inventions and Patents. . . .* Employee will promptly disclose such inventions, innovations and improvements to Employer and perform all actions reasonably requested by Employer to establish and confirm such ownership.

Evidence in the record indicates that as early as April 2002, McCaffery understood that Connelly intended to start her own business and that the line would be called "Sincerely Yours, Karen." (*See* Frederick Supp. Aff., Ex. 1 at 44.) ShopNBC failed to make any request to establish or confirm ownership of the mark until September 3, 2004, several months after Connelly resigned and nearly two years after the expiration of the 1999 Agreement. Indeed, ShopNBC's actions were entirely inconsistent with its assertions of ownership.[5] ShopNBC at all times behaved as if the "Sincerely Yours, Karen" mark belonged to Plaintiffs.

The Court acknowledges that the cases cited by Plaintiffs do not stand for the proposition that a contractual provision could never survive the expiration of an underlying contract. However, even con-

---

**5.**   ShopNBC asserts that Connelly never adequately raised any claim to trademarks with ShopNBC and never gave notice that Connelly expected to own the trademark rights associated with the "Sincerely Yours, Karen" program. The Court disagrees and finds that there is sufficient evidence in the record to demonstrate that Connelly notified ShopNBC

that she was asserting trademark rights in the name "Sincerely Yours, Karen." The fact that Connelly may not have artfully mentioned the word "trademark" during her initial meetings with ShopNBC does not negate the numerous instances where Connelly alerted ShopNBC to her asserted rights.

tractual terms that contain a "survival" clause can expire upon termination of a contract where they are contradicted by the clear terms of a subsequent contract that replaces the prior contract. *See, e.g., Alpha Real Estate v. Delta Dental,* 664 N.W.2d 303, 313–314 (Minn.2003). Here, if ShopNBC believed it was entitled to the rights in the mark "Sincerely Yours, Karen," it was obligated under the terms of the 1999 Agreement to request that Connelly take actions to confirm such ownership on behalf of ShopNBC prior to the expiration of the contract, particularly in light of the fact that it negotiated and executed the 2002 Agreement, which not only excluded Connelly's "Sincerely Yours, Karen" business and its associated trademarks, but also superceded and preempted the 1999 Agreement. (Connelly Aff., Ex. H ¶ 10.) It failed to do so and, as a consequence, cannot now claim ownership over the marks in question.[6]

### 2. The 2002 Agreement

Consistent with its November 9, 2004, Order, the Court again finds that Plaintiffs are likely to establish ownership rights over the "Sincerely Yours, Karen" mark if the 2002 Agreement applies. The only reasonable reading of the 2002 Agreement leads to the conclusion that Connelly's participation in the "Sincerely Yours, Karen" endeavor was outside the scope of the 2002 Agreement and recognized that Connelly would own the trademarks related to the "Sincerely Yours, Karen" business. At a minimum, the term "Outside Interests" is ambiguous and the parol evidence of the parties' discussions and negotiations leading up to the execution of the 2002 Agreement support the conclusion that the 2002 Agreement specifically contemplated and excluded Connelly's "Sincerely Yours, Karen" business.

For all of the above reasons, the Court finds that Plaintiffs are likely to succeed in demonstrating ownership of the "Sincerely Yours, Karen" mark. Having already found, based on its review of the evidence, that Plaintiffs are likely to succeed in demonstrating a likelihood of confusion, the Court again finds that Plaintiffs are likely to succeed on their trademark infringement claims.

### B. Irreparable Harm

The movant must establish that irreparable harm will result if injunctive relief is not granted and that such harm will not be compensable by money damages. *See Packard Elevator v. I.C.C.,* 782 F.2d 112, 115 (8th Cir.1986). ShopNBC asserts that Plaintiffs are not entitled to a presumption of irreparable harm because they have failed to establish a likelihood of success on the merits. Having found that Plaintiffs are likely to succeed on the merits of their trademark claims, however, irreparable harm is presumed here. *See Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397, 403 n. 11 (8th Cir.1987). Even without a presumption, the Court finds that ShopNBC's use of the "Sincerely Yours, Karen" and "Sincerely Yours" marks will cause Plaintiffs to lose control over Connelly's reputation and the goodwill associated with the "Sincerely Yours, Karen" mark.

### C. Balance of Harms

The next *Dataphase* factor to be considered is whether the harm to the movant in the absence of injunctive relief outweighs the potential harm that granting injunctive relief may cause to the non-movant. *See*

---

**6.** The Court also notes that to hold otherwise would render paragraphs 8 and 9 of the 2002 Agreement meaningless.

*Dataphase,* 640 F.2d at 114. ShopNBC contends that granting a preliminary injunction in this case will reverse the status quo since ShopNBC was authorized to sell the "Sincerely Yours, Karen" jewelry line for two years prior to Connelly's departure. ShopNBC claims that it will suffer harm because it will be forced to forgo marketing and selling this jewelry during this case. ShopNBC asserts, on the other hand, that Plaintiffs will suffer minimal harm if ShopNBC's sales continue. While the Court is not unsympathetic to the concerns of ShopNBC, because Plaintiffs have demonstrated a likelihood of confusion in the marketplace, the balance of harms tips in their favor.

### D. Public Interest

The final *Dataphase* factor to be considered by a court is whether injunctive relief is in the public's interest. *See Dataphase,* 640 F.2d at 114. ShopNBC asserts the public interest in upholding valid covenants and contracts is paramount. The Court finds that since it has already determined that Plaintiffs have demonstrated a likelihood of success on the merits of its trademark infringement claim, the public interest is best served by issuing a preliminary injunction. Infringement of a trademark is inherently contrary to the public interest *See Am. Dairy Queen Corp. v. New Line Prods., Inc.,* 35 F.Supp.2d 727, 733 (D.Minn.1998) (Rosenbaum, J.).

The Court finds that Plaintiffs, who have already posted $40,000.00, need not post additional bond.

### Conclusion

The Court concludes that the grant of a preliminary injunction is warranted, but it also believes it is in the best interests of the parties to negotiate a resolution of this dispute. As the parties may already be aware, Magistrate Judge Franklin L. Noel is available to assist in the negotiation of a settlement should the parties find such services to be helpful. If the Court may be of assistance in this matter, the parties should contact Lowell Lindquist, Calendar Clerk for Judge Donovan W. Frank, at 651–848–1296, or Cathy Orlando, Calendar Clerk for Magistrate Judge Franklin L. Noel, at 612–664–5110.

For the reasons stated, **LET IT BE ORDERED THAT:**

1. Plaintiffs Karen J. Connelly's and S.Y.K., LLC's Motion for a Preliminary Injunction (Doc. No. 42) is **GRANTED** as follows.

    a. Defendant ShopNBC, its agents, servants, representatives, successors, assigns, and others in active concert or participation with it, are hereby preliminarily enjoined and restrained from using the "Sincerely Yours, Karen" mark, or any other mark confusingly similar to the "Sincerely Yours, Karen" mark, including the term "Sincerely Yours," in connection with any service or products associated with jewelry or the sale of jewelry.